50 P.3d 1033

STATE of Idaho, Plaintiff–Respondent,

v.

Steve A. SIEGEL, Defendant–Appellant.

No. 26253.

Court of Appeals of Idaho.

April 26, 2002.

Review Denied July 31, 2002.

Molly J. Huskey, Acting State Appellate Public Defender; Mark J. Ackley, Deputy Appellate Public Defender, Boise, for appellant. Mark J. Ackley argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

LANSING, Judge.

Steve A. Siegel was charged with four counts of lewd and lascivious conduct with a minor, Idaho Code § 18–1508. The charges were based on allegations that Siegel molested his eleven-year-old granddaughter, S.S., on four occasions by touching or penetrating her vagina with his finger or penis. Following a jury trial, Siegel was found guilty on all counts, and the district court imposed concurrent, unified thirty-five-year sentences with fifteen-year minimum terms.

Siegel appeals. He contends that the district court committed numerous errors during the trial, including allowing the State to call a late-disclosed witness, allowing that witness to give hearsay testimony about Sie-

**540**

gel's alleged misconduct with another victim, refusing to allow the defendant to present the testimony of a late-disclosed expert witness, and refusing to allow the defendant to present evidence of Siegel's character for truthfulness. Siegel also contends that his sentences are excessive.

## I.

## DISCUSSION

### A. Admission of John Siegel's Testimony

On the day before Siegel's trial, the prosecutor notified Siegel of the prosecutor's intent to call a previously undisclosed witness, the defendant's son and victim's father, John Siegel (John). Siegel moved the court to either exclude John's testimony because the witness had not been timely disclosed, or to grant a continuance so Siegel could prepare to meet the testimony. In response, the prosecutor explained that the disclosure of this witness came so late because John, who lived out of state, had just arrived to attend the trial, and the prosecutor had spoken with him for the first time the day before the trial was to begin. During that conversation, the prosecutor learned that John possessed relevant information, and the prosecutor disclosed him as a potential witness the same day. The district court denied Siegel's motion, and the State was allowed to call John as a witness.

John testified about a telephone conversation he had with Siegel. John said that during the conversation he confronted Siegel with accusations that Siegel had made sexual remarks to, and fondled the chest of, a young girl named Kelly. John testified that during this telephone conversation, Siegel admitted that he put his hand down Kelly's shirt but said that it was an accident that occurred when Siegel slipped. John responded that a psychiatrist had told him to expect Siegel to claim that it was an accident. According to John, he then told Siegel that John believed Siegel had a mental problem and needed

help, to which Siegel answered, "John, I know. I love you, and I'm sorry. And I will get that help."

Siegel objected that this testimony included hearsay and evidence of misconduct that was inadmissible under Idaho Rule of Evidence 404(b). On appeal, he renews his arguments that admission of the testimony violated evidentiary rules and, alternatively, that because of the late disclosure of this witness, Siegel's request for a continuance should have been granted.

### 1. Hearsay objection

■ We consider first Siegel's hearsay objection to John's testimony about information that John received from others. Siegel does not challenge the evidence of *his* comments in the telephone conversation, which are admissions of a party and therefore not hearsay. *See* I.R.E. 801(d)(2)(A).

■ In John's testimony about the telephone conversation, he recounted what others had told him about Siegel allegedly touching Kelly's chest.[1] This testimony would have been hearsay if offered for the truth of the matter asserted. *See* I.R.E. 801(c). However, as the district court ruled, these statements were not offered to prove their truth but to show the context of Siegel's own admissions made during the conversation. It is well established that out-of-court statements are not barred by the hearsay rule when offered to show their effect on the listener. McCORMICK ON EVIDENCE § 249 (John W. Strong ed., 5th. Ed.1999) ("A statement that D made to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X . . . ."). Thus, statements offered only to provide context to a defendant's admissions are not hearsay. *See United States v. Zizzo,* 120 F.3d 1338, 1348 (7th Cir.1997); *United States v. Gutierrez–Chavez,* 842 F.2d 77, 81 (5th Cir.1988); *United States v. Jordan,* 810 F.2d 262, 264 (D.C.Cir.1987); *Williams v. State,* 669 N.E.2d 956, 958 (Ind.1996); *Bun-*

1. Siegel's hearsay objection was raised and argued prior to trial. The arguments were based on the prosecutor's account of what John's testimony would be, which did not include the report of a psychiatrist's comment. Siegel renewed his

hearsay objection when John testified about the alleged fondling of Kelly, but did not object to or move to strike the testimony about the psychiatrist's statement.

*drage v. State,* 265 Ga. 813, 462 S.E.2d 719, 721 (1995); *Atkins v. Commonwealth,* 13 Va. App. 365, 412 S.E.2d 194, 196 (1991). As the court explained in *Gutierrez–Chavez,* 842 F.2d at 81, such statements made to a party in the course of a conversation are admissible "for the limited purpose of putting the responses of the [party] in context and making them 'intelligible to the jury and recognizable as admissions.' " (quoting *U.S. v. Lemonakis,* 485 F.2d 941, 948 (D.C.Cir.1973)). John's testimony recounting allegations about Siegel's conduct with Kelly was admissible for that purpose, and the district court gave an appropriate limiting instruction. Therefore, Siegel's hearsay objection was correctly overruled.

### 2. Rule 404(b) objection

■ Siegel next contends that John's testimony was inadmissible under I.R.E. 404(b) because it included evidence that Siegel had engaged in another molestation that was not among the charges for which he was on trial.

Rule 404(b) prohibits evidence of uncharged misconduct "to prove the character of a person in order to show action in conformity therewith." Evidence of a defendant's uncharged bad acts may nevertheless be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." I.R.E. 404(b); *State v. Hairston,* 133 Idaho 496, 501, 988 P.2d 1170, 1175 (1999); *State v. Atkinson,* 124 Idaho 816, 818, 864 P.2d 654, 656 (Ct.App.1993). Even if evidence of other misconduct is relevant for a permissible purpose under I.R.E. 404(b), it may still be prohibited if its probative value is substantially outweighed by the danger of unfair prejudice. I.R.E. 403; *State v. Phillips,* 123 Idaho 178, 181, 845 P.2d 1211, 1214 (1993); *State v. Tolman,* 121 Idaho 899, 905, 828 P.2d 1304, 1310 (1992); *State v. Whipple,* 134 Idaho 498, 504, 5 P.3d 478, 484 (Ct.App.2000); *Atkinson,* 124 Idaho at 818, 864 P.2d at 656.

The evidence of Siegel's remarks during the telephone conversation presented an implicit admission that Siegel had inappropriately touched Kelly and that he "needed help" to address a problem of engaging in such behavior with young girls. Therefore, our initial inquiry is whether this evidence was relevant for a purpose other than to prove Siegel's bad character and conforming conduct. The Idaho Supreme Court has held that in prosecutions for sex crimes against children, evidence of a defendant's sexual offenses against other children is relevant to demonstrate the defendant's "general plan to exploit and sexually abuse an identifiable group of ... victims," *State v. Moore,* 120 Idaho 743, 745, 819 P.2d 1143, 1145 (1991), and to corroborate the testimony of the victim in the charged offense. *Id.; Phillips,* 123 Idaho at 181, 845 P.2d at 1214; *Tolman,* 121 Idaho at 904, 828 P.2d at 1309. The challenged evidence was relevant for such purposes in the present case.

The trial court's decision that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice is reviewed for an abuse of discretion. *Whipple, supra; Atkinson,* 124 Idaho at 818, 864 P.2d at 656. Here, considering the probative value of Siegel's implied admission that was presented through John's testimony, we cannot say that the district court abused its discretion in applying the balancing test.

### 3. Late disclosure

■ Siegel also argues that because John was not named as a prosecution witness until the day before trial, the district court should have granted a continuance to allow Siegel time to prepare a response to the testimony. The decision to grant or deny a continuance as a result of the late disclosure of a witness is committed to the discretion of the trial court. *State v. Byington,* 132 Idaho 589, 592–93, 977 P.2d 203, 206–07 (1999); *State v. Tapia,* 127 Idaho 249, 255, 899 P.2d 959, 965 (1995). The denial of such a motion will be disturbed on appeal only if it is shown that the tardiness of the disclosure so prejudiced the defendant's case preparation that the defendant was denied a fair trial. *Byington,* 132 Idaho at 592, 977 P.2d at 206; *Tapia,* 127 Idaho at 255, 899 P.2d at 965; *State v. Smoot,* 99 Idaho 855, 859, 590 P.2d 1001, 1005 (1978); *State v. Hawkins,* 131 Idaho 396, 405, 958 P.2d 22, 31 (Ct.App.1998). To

show prejudice, "a defendant must show there is a reasonable probability that, but for the late disclosure of evidence, the result of the proceedings would have been different." *Tapia*, 127 Idaho at 255, 899 P.2d at 965.

Siegel did not meet this standard. First, because Siegel himself was the other party to the alleged telephone conversation about which John would testify, Siegel did not need an "investigation" about the content of the conversation. Siegel argues, however, that he needed investigation time to acquire evidence to discredit the allegations about misconduct with Kelly. This argument fails because nothing in the record indicates that information useful for Siegel's defense could have been acquired if he had been given additional time to investigate the allegations. A bare claim that additional investigation could have been conducted is insufficient to show prejudice. *Id.; Hawkins, supra.* We have previously noted that such a showing can seldom be made on the trial record alone, but will require post-trial proceedings. In *Hawkins*, we explained:

> We recognize that it may be impossible for defendants [faced with late-disclosed evidence] to show actual prejudice from the trial record alone. This underscores the importance of taking appropriate post-trial steps to create the necessary record to support an appeal. Rather than relying solely on the trial record and asking this Court to speculate as to whether the defendant was prejudiced by the trial court's denial of a continuance or sanctions, the better practice is to move for a new trial in the district court, pursuant to I.C. § 19-2406(5) or (7), taking that opportunity to present to the trial court … evidence that would demonstrate prejudice from the court's earlier denial of an adequate remedy for the State's untimely disclosure. Such a post-trial measure would not only allow development of the necessary record for appeal, but may obviate the need for an appeal by giving the trial court an opportunity to grant a new trial where prejudice can be demonstrated.

*Hawkins*, 131 Idaho at 406, 958 P.2d at 32. *See also State v. Pecor*, 132 Idaho 359, 364, 972 P.2d 737, 742 (Ct.App.1998). Because

Siegel has not demonstrated prejudice, we will not disturb the trial court's denial of his request for a continuance.

**B. Exclusion of Testimony from Defendant's Expert**

Siegel's trial was originally scheduled for August 24, 1999, but it was continued on Siegel's motion to November 30. Siegel filed a second motion to continue on November 12. The motion was denied, but the trial was rescheduled to begin on December 1. On the first day of his trial, Siegel disclosed the subject matter of testimony that he would offer through a mental health professional. It was disclosed that the expert witness, James Ferguson, would testify that he had administered a test called the Sexual Adjustment Inventory (SAI) to evaluate Siegel and that based on the results of this test, Ferguson was of the opinion that Siegel did not pose a risk of sexually offending against children. The State objected to this proposed evidence on the grounds that the disclosure was untimely and that the evidence did not meet the I.R.E. 702 standard of admissibility for expert opinions. The district court excluded the evidence, and Siegel contends that this ruling was error.

The district court disallowed Ferguson's testimony both because Siegel had not timely disclosed that he intended to call Ferguson as an expert and because, in the district court's view, the testimony was inadmissible due to a lack of adequate foundation to show that the SAI, upon which Ferguson based his opinion, was an accurate and reliable methodology to differentiate between persons who will sexually offend and those who will not. Because we sustain the district court's decision on the basis of the untimely disclosure, we need not address the adequacy of the foundation for the proffered expert testimony.

Siegel named Ferguson as a prospective witness only five days before trial, and even then did not disclose that Ferguson would be an expert. It was two days before trial when Siegel notified the prosecutor that Ferguson would give expert testimony, but the content of his proposed testimony was not disclosed. Siegel finally made Ferguson's report, con-

taining the substance of his proffered testimony, available to the prosecutor on the first day of trial.

A criminal defendant's right to offer testimony is derived from the Sixth Amendment's compulsory process clause, and that right can be violated by the imposition of a discovery sanction that excludes a material defense witness. *Taylor v. Illinois*, 484 U.S. 400, 409–10, 108 S.Ct. 646, 653–54, 98 L.Ed.2d 798, 810–11 (1988); *State v. Harris*, 132 Idaho 843, 846, 979 P.2d 1201, 1204 (1999). However, the right to present exculpatory evidence is not without limitation. "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case." *Taylor*, 484 U.S. at 410–11, 108 S.Ct. at 654, 98 L.Ed.2d at 811. Thus, the determination whether to exclude a defense witness for late disclosure is committed to the trial court's discretion. *Harris*, 132 Idaho at 847, 979 P.2d at 1205; *State v. Lamphere*, 130 Idaho 630, 633, 945 P.2d 1, 4 (1997).

In exercising its discretion, "the trial court must consider whether the State would be prejudiced from the late disclosure if the evidence were admitted and weigh that prejudice against the defendant's right to a fair trial." *State v. Thomas*, 133 Idaho 800, 802, 992 P.2d 795, 797 (Ct.App.1999). Thus, in *Harris*, the Idaho Supreme Court reversed a decision of the trial court disallowing testimony of a defense witness whose identity had been inadvertently omitted from the pretrial disclosure of defense witnesses. The Supreme Court held that the exclusion of the witness could not be sustained because the trial court had not weighed any prejudice that might be suffered by the State against the defendant's right to a fair trial, and the trial court compounded the error by letting the prosecutor determine whether the State would be able to interview the witness and be prepared to respond to the testimony. *Harris, supra.*

The trial court in the present case did not make such an error. It specifically consid-

ered the prejudice to the State, noting that the SAI, upon which Ferguson's testimony would be based, was a relatively new testing instrument that had not been widely used or generally accepted among mental health professionals. The court stated, "The very newness of this makes late disclosure to the opposing party increasingly prejudicial. Finding comparable experts [who are] competent to respond would obviously be harder."

We find no fault with the district court's decision. In *State v. Miller*, 133 Idaho 454, 457, 988 P.2d 680, 683 (1999), the Idaho Supreme Court impliedly recognized that the prejudice resulting from late disclosure may be greater when the witness is an expert. The testimony of an expert witness often cannot be swiftly analyzed and countered, and this is especially true where, as here, the expert's opinion is based on a methodology that is not in common usage. Further, in weighing the importance of the excluded testimony to the defendant's case, it must be recognized that Ferguson would not have testified that Siegel did not commit the charged crimes; Ferguson proposed only to testify that Siegel did not appear to have mental characteristics that are associated with persons who molest children. We conclude that the district court did not abuse its discretion in holding that the prejudice to the State outweighed Siegel's interest in presenting the late-disclosed evidence.

Siegel argues that rather than excluding Ferguson's testimony as a discovery sanction, the district court should have continued the trial to allow the State sufficient time to prepare to meet this evidence. However, the trial had already been continued for more than three months at Siegel's request, and Siegel offered no explanation, other than his attorney's heavy caseload, as to why Ferguson could not have been retained, and his evaluation disclosed, sooner. As the State points out, requiring a continuance whenever the defense discloses evidence on the first day of trial would effectively allow defendants to avoid trial indefinitely and would provide little incentive for defendants to comply with discovery rules. Siegel has not

shown that the district court abused its discretion in denying a continuance.

## C. Evidence of Defendant's Truthfulness

 Siegel testified at his trial, denying his granddaughter's accusations. In cross-examining him, the prosecutor suggested that Siegel was biased by his own self-interest in the outcome of the case. Siegel thereafter attempted to present the testimony of several witnesses who would testify to his character for truthfulness. The State objected to this testimony, and the trial court excluded it. Siegel now challenges this ruling, arguing that the prosecution opened the door to such character testimony by the cross-examination of Siegel that impugned his veracity.

The evidentiary rule governing the use of evidence of a witness's character for truthfulness or untruthfulness is I.R.E. 608(a), which provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Siegel concedes that his character for truthfulness had not been attacked by opinion or reputation evidence, but he avers that it was "otherwise" attacked during his cross-examination when the prosecutor asked Siegel to admit that he had "the most to lose or gain depending upon the jury's decision in this case," and asked whether Siegel was "willing to admit that you're the most biased witness this jury's going to hear from."

The issue thus presented is whether the cross-examination questions accusing Siegel of bias amount to an attack on his character for truthfulness within the meaning of Rule 608(a)(2). The intent behind I.R.E. 608(a)(2) is illuminated by the Advisory Notes to Federal Rule 608(a), which is identical to our rule. According to the Advisory Notes, evidence of a witness's bias does not open the door to rebuttal evidence of the witness's character for truthfulness:

> Opinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category. *Evidence of bias or interest does not.* Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstances.

(Emphasis added) (citation omitted). Consistent with the Advisory Notes, the Ninth Circuit Court of Appeals has held that cross-examination of a defendant about inconsistencies between his testimony and that of other witnesses, and about the defendant's interest in the outcome of the case, did not enable the defendant to present rehabilitative evidence of his truthful character. *United States v. Dring,* 930 F.2d 687 (9th Cir.1991). In that opinion, the court distinguished between an attack on the witness's general truthfulness and impeachment of a witness by implication of bias or interest:

> The purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness. To this end, the Rule prohibits rehabilitation by character evidence of truthfulness after direct attacks on a witness's veracity in the instant case. However, the Rule permits rehabilitation after indirect attacks on a witness's general character for truthfulness.
>
> . . . .
>
> Thus, evidence of a witness's bias for or against a party in the instant case, or evidence of a witness's interest in the outcome of the instant case, constitutes a direct attack that does not trigger rehabilitation under Rule 608(a). For example, it would be permissible to imply that, because of *bias* due to *family relationship,* a father is lying to protect his son. Such evidence directly undermines the veracity and credibility of the witness in the instant case, without implicating the witness as a liar in general. By way of contrast, indirect attacks on truthfulness include opinion

evidence, reputation evidence, and evidence of corruption, which require the jury to infer that the witness is lying at present, simply because he has lied often in the past.

*Dring,* 930 F.2d at 690–91 (emphasis in original, citations omitted).

The Idaho appellate courts have not previously considered the applicability of Rule 608(a)(2) where a witness's veracity has been challenged through allegations of bias, but this Court has addressed the related question of whether character evidence rebuttal is authorized when the veracity of a witness's testimony has been impeached with prior inconsistent statements and contradictory evidence. We held that such impeachment did not open the door to opinion testimony about the witness's character for truthfulness:

> [C]ross-examination which attacks the witness's testimony, but which contains no personal attack upon the witness's veracity, does not trigger a right to present opinion testimony on the witness's character for truthfulness.
>
> . . . .
>
> It cannot be gainsaid that identification of . . . inconsistencies may reflect incidentally upon a witness's credibility. However, if this incidental effect were deemed to constitute an attack upon the witness's character within the meaning of the term "otherwise" in Rule 608(a), then the rule would be swallowed by its own exception.

*Pierson v. Brooks,* 115 Idaho 529, 533, 768 P.2d 792, 796 (Ct.App.1989).

In our view, the cross-examination employed in Siegel's case to show his bias was no more of an attack on the witness's general truthfulness than was the questioning about prior inconsistent statements in *Pierson.* Consequently, we hold that the prosecutor's cross-examination of Siegel did not entitle Siegel to introduce evidence of his truthful character under I.R.E. 608(a)(2).

## D. Sentences

Lastly, we consider Siegel's contention that the district court abused its discretion by imposing concurrent unified thirty-five-year sentences with fifteen-year minimum terms. Both our standard of review and the factors to be considered in evaluating the reasonableness of a sentence are well established. *See State v. Hernandez,* 121 Idaho 114, 117–18, 822 P.2d 1011, 1014–15 (Ct.App.1991); *State v. Lopez,* 106 Idaho 447, 449–51, 680 P.2d 869, 871–73 (Ct.App.1984); *State v. Toohill,* 103 Idaho 565, 650 P.2d 707 (Ct.App.1982). Where a sentence is within the statutory limits, it will not be disturbed on appeal absent an abuse of the sentencing court's discretion. *State v. Hedger,* 115 Idaho 598, 768 P.2d 1331 (1989). We will not conclude on review that the sentencing court abused its discretion unless the sentence is unreasonable under the facts of the case. *State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992). In evaluating the reasonableness of a sentence, we consider the nature of the offense and the character of the offender, applying our well-established standards of review. *See Hernandez, supra; Lopez, supra; Toohill, supra.* We treat the minimum term specified by the sentencing judge as the probable duration of confinement. *State v. Sanchez,* 115 Idaho 776, 769 P.2d 1148 (Ct.App.1989).

In support of his contention that his sentence is excessive, Siegel asserts that the district court gave inadequate consideration to Mr. Ferguson's report on the SAI test which, although excluded from evidence at trial, was attached to the presentence investigation report (PSI). It contained Ferguson's conclusions that Siegel showed no indication of a sexual disorder and was a low risk to commit sexual misconduct. We note, however, that Ferguson's conclusions were contradicted not only by the jury verdict in this case but by information in the PSI about other sexual molestations by Siegel. The PSI included information about Siegel's fondling of Kelly, which was referenced in the trial. It also disclosed that another of Siegel's granddaughters, at three years old, told her mother that Siegel "licked her pee pee." Another relative reported that, approximately fifteen years earlier, he had witnessed Siegel sexually molest a sixteen-year-old girl after she became so drunk that she passed out. The PSI also shows that Siegel lied about his personal history and family rela-

tionships during the presentence investigation.

Siegel's egregious behavior in the present case includes sexual intercourse with his eleven-year-old granddaughter and putting his fingers in her vagina. Siegel accepted no responsibility for these offenses and demonstrated no remorse or concern for the child's well-being. On this record, we cannot say that the district court gave inadequate consideration to the Ferguson evaluation or that the sentence imposed by the district court is an abuse of discretion.

## II.

### CONCLUSION

Siegel has not shown reversible error in the district court's denial of his request for a trial continuance, in the trial court's rulings on evidentiary issues, or in the sentences imposed. Accordingly, the judgment of conviction and sentences are affirmed.

Judge Pro Tem MEEHL concurs.

Judge Pro Tem SCHWARTZMAN (following his retirement) Specially Concurring.

I write separately to further explicate several areas of legal concern:

1. The *late disclosure* of John Siegel as a witness, on the very day of trial, is an issue of no small concern. This case conjures up shades of *State v. Byington*, 132 Idaho 597, 977 P.2d 211 (Ct.App.1998); *affirmed on review*, 132 Idaho 589, 977 P.2d 203 (1999). *See* respective dissents of Judge Schwartzman and Justice Schroeder. I am constrained, however, to concur with the majority opinion here that no prejudice was shown by the late disclosure, as the evidence was relatively straightforward, succinct, and con-

fined to a recent phone call in which the defendant himself participated. Nevertheless, trial courts should be *Argus-eyed* in assuring reasonable diligence and compliance with discovery mandates so that the exception does not swallow up the rule.

2. During cross-examination, Siegel was interrogated as to whether he had the most to lose or gain in this case and whether he would admit to being the most biased person the jury would hear. A simple objection to this line of inquiry as argumentative rhetoric *should* have been sustained.[1] Nothing in the opinion should be read as condoning this type of questioning.

3. The district court ruled that the substance of Ferguson's report, together with his expert testimony related thereto, was inadmissible due to a lack of adequate foundation to show that the SAI was an accurate and reliable methodology to differentiate between persons who will sexually offend and those who will not. Based upon a reading of *State v. Konechny*, 134 Idaho 410, 3 P.3d 535 (Ct.App.2000) and *State v. Parkinson*, 128 Idaho 29, 909 P.2d 647 (Ct.App.1996), this ruling is eminently correct and I would affirm on this basis as well.

James Ferguson is an evaluator/counselor with experience in diagnosing and treating people with paraphilia (e.g., pedophilia).[2] Ferguson would testify about a diagnostic tool called the Sexual Adjustment Inventory (SAI) and opine, based on Siegel's performance in the test and interviews with him, that Siegel was a low risk to commit sexual offenses such as those charged. The state objected that the expert's opinion and the SAI were inadmissible character evidence, i.e., evidence of non-criminal propensity offered to prove that Siegel acted in accord with that propensity rather than as charged. The state further argued that the SAI did

---

1. An astute witness might respond, in a similar caustic vein, as follows: "With the possible exception of yourself, Mr. Prosecutor, that might be true." Indeed, the deputy prosecutor involved here has built up a less-than-felicitous appellate track record with this Court. *See, e.g., State v. Lovelass*, 133 Idaho 160, 983 P.2d 233 (Ct.App. 1999); *State v. Vandenacre*, 131 Idaho 507, 960 P.2d 190 (Ct.App.1998); *State v. Brown*, 131 Idaho 61, 951 P.2d 1288 (Ct.App.1998).

2. Mr. Ferguson's educational background includes a bachelor's degree in psychology-sociology-religion, a master's degree in education/counseling, and he is a certified clinical criminal justice specialist in the area of drugs, alcohol and domestic violence.

not meet the standards for admitting scientific or technical evidence by an expert.

The SAI consists of a battery of multiple choice and true-false questions. The subject's responses are entered into a computer, which analyzes and scores the test. The test has thirteen scales corresponding to characteristics that are common to sex offenders. The test also attempts to score general truthfulness and honesty regarding sexual questions. The test is accompanied by interviews of the subject. Ferguson's testimony compared the SAI to the more commonly used Minnesota Multiphasic Personality Inventory (MMPI). He stated that the SAI has been tested and referenced to the MMPI and that the SAI uses the same basic methodology as the MMPI.

The only other evidence offered in support of the SAI was a document entitled "Sexual Adjustment Inventory (SAI): Inventory of Scientific Findings" (SAI Findings), which was produced by the company that created and markets the test, Risk and Needs Assessment, Inc. (RNA, Inc.). The SAI Findings describe each of the scales and what they test for. Although the SAI Findings are written in technical terms, the document is essentially a marketing tool promoting the value of the test and its superiority to other sexual evaluation tests. The SAI Findings contain a number of claims regarding the statistical accuracy of the test. Most are based on the results of the test when given to known sex offenders; one of the tests compared the results when given to known sex offenders to results obtained from non-offenders. It appears that all the tests discussed in the SAI Findings were conducted by RNA, Inc. There is little in the evidence to explain the significance of the statistics in the SAI Findings or how they were calculated.

The state argued that Siegel failed to lay any foundation showing that the SAI was a scientifically valid way of reliably showing whether an individual committed a particular sexually predatory act. The state further asserted that the studies Siegel relied upon did not show that the SAI was a reliable tool. There was no evidence of independent testing; all testing presented by Siegel was done

by RNA, Inc. There was also no indication that any of those studies had been reproduced independently. Finally, even if the SAI were sufficiently reliable to be admissible, the state argued that it did not show whether the individual tested actually did or did not commit a particular sexually predatory act.

The legal standard for the admission of expert testimony is found in I.R.E. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The determination of whether expert testimony will assist the trier of fact turns on whether it is based on information, theory or methodology that have sufficient indicia of reliability. *Konechny*, 134 Idaho at 417, 3 P.3d at 542. "[T]he key to admission of [an expert's] opinion is the validity of the expert's reasoning and methodology.... The court's function is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." *Id.* (quoting *Ryan v. Beisner*, 123 Idaho 42, 46, 844 P.2d 24, 28 (Ct.App.1992)).

This Court previously considered evidence that a defendant did not fit the psychological profile of a sexual offender in *State v. Parkinson, supra.* We held that a sufficient foundation for the evidence had not been laid, relying in part on the analysis employed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The *Parkinson* Court recited the *Daubert* factors for consideration of expert testimony:

> These factors include whether the theory or technique in question can be tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards governing its use, and whether it has attracted widespread accep-

tance within a relevant scientific community.

*Parkinson,* 128 Idaho at 34, 909 P.2d at 652. The Court also listed several other factors identified by various courts:

> (1) the presence of safeguards in the technique; (2) analogy to other scientific techniques whose results are admissible; (3) the nature and breadth of inferences drawn; (4) the extent to which the basic data are verifiable by the court and jury; (5) availability of other experts to test and evaluate the technique; (6) the probative significance of the evidence in the circumstances of the case.

*Id.* In reaching its holding, the Court pointed out that the expert did not:

> describe the personality or psychological characteristics that made up the profile; describe the methodology by which the profile was derived; state whether or how the technique had been tested; describe the profile's level of accuracy in distinguishing between offenders and non-offenders; or state whether the profile and the assessment technique utilized by [the expert witness] had attracted widespread acceptance within the psychological community.

*Id.* at 35, 909 P.2d at 653.

Siegel has made at best a minimal showing that the SAI is based on a sound methodology and is an effective tool for showing whether someone is likely to have committed a sexual offense. Ferguson's testimony was conclusory and he could cite only to literature from the company that makes and markets the test to support his claims. All but one of the studies recited in the SAI Findings dealt with the independence of the scores on the various scales rather than on the ability of the test to differentiate between sexual predators and normal individuals. Only one test attempted to compare test results from known sex offenders with those from the general population. Although the SAI Findings claimed to have found a significant difference in scores, the value of this study is clouded by unexplained statistical jargon. Finally, I reiterate, as did the Court in *Parkinson,* "that the introduction of expert testimony regarding whether a defen-

dant fits an alleged sexual offender profile has been almost universally rejected in other jurisdictions." 128 Idaho at 33, 909 P.2d at 651 (citations omitted).

Accordingly, I would further hold that the district court committed no error in' excluding Ferguson's testimony.